**Case No. 12-5229**

In The

# United States Court of Appeals for the District of Columbia Circuit

SAMUEL MOLINA

*Appellant,*

*vs.*

FDIC, *et al.*,

*Appellees.*

*On Appeal from the United States District Court for the District of Columbia (Hon. Amy Berman Jackson, Judge)*

## BRIEF FOR APPELLANT

IAN STUMPF, ESQ. (USCA DC Bar #53862)
JR HOWELL & ASSOCIATES, P.C.
515 8th Street, SE
Suite 1
Washington D.C. 20003
P: (202) 518-2591
F: (202) 518-2571
istumpf@jrhlegalstrategies.com
*Counsel for Appellant*

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

### A. PARTIES AND AMICI

The following parties and intervenors appeared in the United States District

Court for the District of Columbia:

FEDERAL DEPOSIT INSURANCE CORPORATION
c/o Jeffrey E. Schmitt, Esq.
Federal Deposit Insurance Corporation
3501 Fairfax Drive
Arlington, VA 22226

OCWEN LOAN SERVICING
c/o Kenneth John Pfaehler, Esq.
SNR DENTON US LLP
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005

SHAPIRO & BURSON LLP
c/o Bizhan Beiramee, Esq.
BIZHAN BEIRAMEE, ESQ., P.C.
6663 B Old Dominion Drive
Third Floor
McLean, VA 22101

c/o Gary C. Tepper, Esq.
BALLARD SPAHR, LLP
601 13th Street, N.W.
Suite 1000 South
Washington, DC 20005-3807

c/o Glenn A. Cline, Esq.
c/o Robert A. Scott, Esq.
BALLARD SPAHR, LLP
300 East Lombard Street
18th Floor
Baltimore, MD 21202

SAMUEL MOLINA
c/o Ian Stumpf, Esq. (USCA DC Bar #53862)
JR HOWELL & ASSOCIATES
1325 G Street NW
Suite 500
Washington, D.C. 20005
P: 202.552.7386
F: 202.518.2571
istumpf@jrhlegalstrategies.com

DIVERN COMBS (Intervenor)
c/o Ian Stumpf, Esq. (USCA DC Bar #53862)
JR HOWELL & ASSOCIATES
515 8th Street, SE
Suite 1
Washington, D.C. 20005
P: 202.552.7386
F: 202.518.2571
istumpf@jrhlegalstrategies.com

The following parties will appear in this matter before the United States

Court of Appeals for the District of Columbia Circuit:

SAMUEL MOLINA
c/o Ian Stumpf, Esq. (USCA DC Bar #53862)
JR HOWELL & ASSOCIATES
515 8th Street, SE
Suite 1
Washington, D.C. 20003
P: 202.518.2591
F: 202.518.2571
istumpf@jrhlegalstrategies.com

OCWEN LOAN SERVICING
c/o Kenneth John Pfaehler, Esq.
DENTONS US LLP
1301 K Street, NW

ii

Suite 600, East Tower
Washington, DC 20005

## B. RULINGS UNDER REVIEW

The ruling at issue in this Court is the Hon. Amy Berman Jackson's ruling of

June 28, 2012 dismissing the U.S. District Court case. The Hon. Amy Berman

Jackson's Order and the related Memorandum Opinion can be found in the

Appendix at ECF #39 and #40, respectively. The official citation for this ruling

can be found at: *Molina v. FDIC*, 870 F. Supp. 2d 123 (D.D.C. 2012).

## C. RELATED CASES

This case has not previously been before this Court and no related cases

have been before this Court. Appellee contended that a related case is currently

pending before the Supreme Court in its briefing with the U.S. District Court:

*Gallagher v. Magner*, 619 F.3d 823 (8th Cir. 2010), *cert. granted*, 132 S. Ct. 548

(2011).

## CORPORATE DISCLOSURE STATEMENT

No. 12-5228     Caption: Molina v. FDIC, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1, the appellant, Samuel Molina, makes the following disclosure:

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ■ NO

2. Does party/amicus have any parent corporations? ☐YES ■ NO
   If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ■ NO
   If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))? ☐YES ■ NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ■ NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ■ NO
   If yes, identify any trustee and the members of any creditors" committee:

Dated: July 19, 2013

Ian Stumpf
*Attorney for Appellant*

## TABLE OF CONTENTS

STATEMENT OF JURISDICTION AND THE CASE……………….............1

STATEMENT OF THE ISSUES ........................................................................ 2

STATEMENT OF FACTS............................................................................... 2

SUMMARY OF THE ARGUMENT………………………………………17

ARGUMENT....................................................................................... 18

    I.     The Standard of Review……………………………………………18

    II.    Mr. Molina Has Standing Under the FHA Because He Has
            Alleged Injury In The Form Of Denied Opportunity And Ocwen's
            Failure To Make Available To Him Certain Protected
            Transactions……………………………………………………..19

    III.   Even If This Court Finds That Mr. Molina Lacks Standing,
            He Should Be Permitted Leave To Amend The
            Complaint On Remand…………………………………………..28

CONCLUSION.................................................................................... 28

TEXT OF PERTINENT STATUTES AND REGULATIONS…………………30

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)…………………...41

CERTIFICATE OF SERVICE…………………………………………….........42

## TABLE OF AUTHORITIES[*]

*ACLU Foundation of Southern California v. Barr*,
    952 F.2d 457, 467 (D.C. Cir. 1991)………………………………………..19

*\*Alfred L. Snapp & Son v. P.R.*,
    458 U.S. 592, 608 (U.S. 1982)……………………………………………...26

*Ashcroft v. Iqbal,*
    556 U.S. 662, 129 S. Ct. 1937, 1949-50 (2009)…………………………….23

*\*Barrows v. Jackson*,
    346 U.S. 249 (U.S. 1953)…………………………………………………...27

*Browning v. Clinton*,
    292 F.3d 235, 242 (D.C. Cir. 2002)………………………………….…..18

*\*Gladstone, Realtors v. Village of Bellwood*,
    441 U.S. 91, 95, 113 n. 25 (1979)………………………………………….27

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
    333 F.3d 156, 161-162 (D.C. Cir. 2003)…………………………...……..18

*\*Mayers v. Ridley*,
    465 F.2d 630, 654 (D.C. Cir. 1972)………………………………………..27

*\*Spann v. Colonial Village, Inc.*,
    899 F.2d 24, 28 (D.C. Cir. 1990)…………………………………….…..28

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

vi

## GLOSSARY

**FICO:** is a public company that provides analytics and decision making services—including credit scoring—intended to help financial services companies make complex, high-volume decisions.

**FHA:** refers to the Fair Housing Act, 42 U.S.C. 3601, *et seq.*

**HAMP:** The Home Affordable Modification Program, also known as HAMP, is a federal program of the United States, set up to help eligible home owners with loan modifications on their home mortgage debt. It is being set up in the context of the ongoing subprime mortgage crisis in the debt markets, continuing from 2008.

**NCRC:** refers to the group "National Community Reinvestment Coalition."

**Ocwen:** refers to Appellee Ocwen Loan Servicing.

**REO:** refers to an acronym for "Real Estate Owned" and is a class of property owned by a lender—typically a bank, government agency, or government loan insurer—after an unsuccessful sale at a foreclosure auction.

**Subprime loans:** A loan offered to an individual who does not qualify for a loan at the prime rate due to their credit history.

## STATUTES AND REGULATIONS

42 U.S.C. § 3602…………………………………………………………………..24

42 U.S.C. § 3604(b)…………………………………………………………………..24

42 U.S.C. § 3605…………………………………………………………………..25

42 U.S.C. § 3613(a)(1)(A)…………………………………………………………….23-24

24 C.F.R. § 100.50(b)(3)…………………………………………………………..25

24 C.F.R. § 100.70(b)…………………………………………………………..25

## STATEMENT OF JURISDICTION AND THE CASE

Jurisdiction of the United States District Court for the District of Columbia for this matter was founded on 28 U.S.C. § 1331 and 28 U.S.C. § 1332(a)(1). The district court had subject matter jurisdiction because this civil action concerned questions of federal law arising under the Fair Housing Act and Civil Rights Act. Additionally, the district court had diversity jurisdiction over this civil action because the matter in controversy exceeded the sum or value of $75,000, exclusive of interest and costs, and was between citizens of different states.

Jurisdiction for this Court for this matter is founded on 28 U.S.C. § 1291 ("[t]he courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States") and 28 U.S.C. § 1294.

On October 3, 2011, Appellant filed his Complaint in the United States District Court for the District of Columbia on behalf of himself and a proposed class of people against Appellee Ocwen and other defendants. (A10-115). As to Appellee Ocwen, Appellant alleged individual and class claims of disparate impact violations of the Fair Housing Act and Section 1982 of the Civil Rights Act. (A37-41). On December 12, 2011, Appellee Ocwen filed a Motion to Dismiss the Complaint, arguing that Appellant failed to state a claim against Appellee Ocwen as to both claims. (A116-161). The other defendants also filed their respective motions to dismiss, to which Appellant Molina timely opposed. On December 27,

1

2011, Appellant Molina filed his Opposition to Appellee Ocwen's Motion to Dismiss. (A162-213). On Janaury 20, 2012, Appellee Ocwen filed its Reply to Opposition to Motion to Dismiss. (A214-233). On June 28, 2012, the Hon. Amy Berman Jackson of the United States District Court of the District of Columbia found in favor of Appellee Ocwen and the other defendants and granted their motions to dismiss. (A234-250). The United States District Court's Order of June 28, 2012 was a final order that disposed of Appellant's claims. On July 19, 2012, Appellant Molina timely filed Notice of Appeal of the United States District Court's decision as to Appellee Ocwen. (A251).

## STATEMENT OF THE ISSUES

Whether Appellant Molina alleged standing under the Federal Fair Housing Act where he alleged that his loan servicer failed to make available certain loan modification programs that were more readily available to non-minority borrowers and where he alleged that his loan servicer denied him certain privileges and facilities in connection with homeownership by reason of his race and national origin.

## STATEMENT OF THE FACTS

### A. Appellant Molina's Background and Subprime Loan Refinance

Appellant Molina was born in El Salvador and lives in the United States as a permanent resident alien. The Property located at 2513 Massey Court, Alexandria,

Virginia, 22303 (the "Property") is Appellant's primary residence. Appellant purchased the Property in 1996 and refinanced in January of 2006 into a twenty-year mortgage loan for $275,000.00 at a fixed yearly interest rate of 6.125%.

At the time of the refinance, Appellant Molina spoke Spanish and had no degree of English proficiency that would have enabled him to understand the loan application documents or the documents presented to him at settlement. Settlement was conducted in English, and all required disclosures provided to Appellant at this time were printed in English as well. His limited knowledge of the English language was insufficient for him to understand the loan disclosures he was given.

Molina's loan application was prepared on his behalf by the company that conducted his refinance, but this company completely misrepresented the financial data upon which Molina was to base his decision to enter into the loan in question. (A49-53). The loan application misrepresented Molina's monthly liabilities by over $1,000.00. (A49-53). This falsely represented to Molina how costly his monthly mortgage payment would actually be in relation to his monthly income. The true state of Molina's monthly expenses, with the mortgage payment, was actually 65% of his gross monthly income. Yet, the figures that were stated on the loan application represented a significantly lower debt-to-income ratio. In the end,

3

Molina was placed into a high-risk loan without regard to his ability to repay over the life of the loan.

### B. Appellee Ocwen's Servicing Practices

After settlement, Appellant's loan was designated as subprime and bundled with other subprime mortgages and sold off to investors as a mortgage-backed security. At some point after settlement, Appellee Ocwen acquired the rights to service Appellant Molina's subprime mortgage. Appellee Ocwen obtained fees through the servicing of Appellant Molina's mortgage. Appellee Ocwen also has affiliates or corporate partners through which it collects fees in the process of debt collection, foreclosure, REO, and bankruptcy processes.

In April of 2011, the Federal Reserve, Office of the Comptroller of the Currency, and Office of Thrift Supervision issued an Inter-agency Review of Foreclosure Policies and Practices that specifically mentioned Appellee Ocwen. This report examined the servicing practices of the largest loan servicers in the country. The report cites systemic failings: "inadequate policies, procedures, and independent control infrastructure covering all aspects of the foreclosure process . . . inadequate quality control and audit reviews to ensure compliance with legal requirements, policies and procedures, as well as the maintenance of sound operating environments . . . inadequate identification of financial, reputational, and legal risks, and absence of internal communication about those risks among boards

of directors and senior management." The report also states that, "examiners found inadequate organization and staffing of foreclosure units to address the increased volumes of foreclosures." The report further states, "examiners found weaknesses in quality control and internal auditing procedures at all servicers included in the review." Notably, the report cites "weak controls, undue emphasis on quantitative production and timelines, and inadequate workload monitoring." The report specifically states that, "examiners found weaknesses in internal auditing and procedures at all servicers included in the review", and that when these audits were performed, "the few internal audits conducted by servicers failed to identify fundamental control issues that led to the foreclosure process breakdowns."

After the report was released, the Federal Reserve released a statement in which it states: "These deficiencies represent significant and pervasive compliance failures and unsafe and unsound practices at these institutions." The statement also provided that these systemic deficiencies amount to "a pattern of misconduct and negligence."

Appellee Ocwen is one of the largest sub-prime mortgage servicers in the United States. Through the years, Appellee Ocwen gained a national reputation as a servicer specializing in the management of sub-performing and non-performing

assets, including severely-delinquent and labor-intensive mortgage loans and REO

assets requiring what it termed a "hands-on approach."

Prior to the subprime lending boom in the Mid-2000s, Ocwen altered its

business strategy to take advantage of financial opportunities available as a debt

servicer for third-party investors.  In the past decade, Ocwen acquired and

managed more than $4.5 billion in distressed real estate debt on its own behalf.

Throughout the 2000s, Ocwen revamped and honed its business strategy to

focus on the acquisition of subprime loans and profiting from financial

administration services related to its servicing operation and acquiring fees through

the foreclosure and bankruptcy process.  In this time period, Ocwen began

partnering with private equity funds to raise money for their "Asset Management

Vehicles," populated by subprime loans, from which they acquire fees through

servicing and foreclosure processes.  Ocwen's investment strategies focused on

what it termed "credit sensitive opportunities in the residential mortgage sector

where Ocwen's loss mitigation expertise and competitive cost structure generates

attractive returns."  Ocwen's advantage in this area was based on its touted

knowledge of collateral combined with an extensive database of real time

mortgage performance and real estate prices.  Ocwen's servicing portfolio totaled

355,597 loans (excluding REO) for an unpaid principal balance of approximately

$51 billion as of April 30, 2010.  The portfolio is comprised of subprime loans

(61.8%), non-performing loans (17.1%), Alt-A loans (9.1%), prime loans (7.5%). second lien and HLTV loans (4.5%), and a small number of HUD loans on a UPB basis. Ocwen employs 1,421 servicing employees worldwide and experienced turnover of approximately 43% for its worldwide staff for the 12 months ending April 30, 2010. Ocwen's internal proprietary systems consist, in part, of special data modeling that enable Ocwen to determine the likelihood of borrower default or prepayment, present and future housing prices, and loan resolution. Ocwen also employs psychologists in helping it determine its loan servicing strategies.

By 2008, Ocwen's rating with Standard & Poor's seriously declined, dragged down, in part, by its inadequate servicing operations. A subsequent ratings report in 2009 noted that "Ocwen serves as a backup servicer in various capacities for a significant volume of securitized mortgage backed securities," and remarked that if its servicing portfolio continued to deteriorate, Standard & Poor's would revisit its rating once more.

Ocwen maintains a system of discretion-based foreclosure alternatives that have a disparate impact on the members of Appellant's proposed class. Ocwen's staff has discretionary authority to enter into short-term repayment plans with borrowers based upon company-established guidelines. Repayment plans outside of the pre-established guidelines require supervisory approval and have an average multiple payment rate of approximately 80%. Foreclosure alternatives and

foreclosure are pursued simultaneously on a dual track. Foreclosure alternatives

are conducted by loan resolution counselors, primarily located at the West Palm

Beach headquarters, although the company has expanded this function to its

Orlando call center location. The loan resolution department conducts loss

mitigation analysis on all loans past 90 days due. The company's proprietary loan

resolution workstation is used to perform a net present value analysis and track

workout approvals. Based upon property valuation information, updated financial

data from the borrower, reasons for default, and willingness to pay, the loan

resolution workstation performs a comparative analysis with the projected carrying

costs of foreclosure and REO marketing to assist the counselor in developing the

best exit strategy for a particular loan in default. The resulting foreclosure

alternative options that derive from Ocwen's loan resolution workstation is based

on a data model that takes into account factors, such as property valuation, reason

for default, and repayment ability,[1] that disproportionately exclude American-born

Latinos and Latino immigrants and place them at heightened vulnerability to the

financial and immaterial harms of foreclosure.

     While Ocwen's foreclosure alternatives emphasize slow deliberation, its

foreclosure policies emphasize speed—often at a reckless pace. With over 600

---

[1] According to the Pew Hispanic Center, from 2009 to 2010, the median weekly
earnings of foreign-born workers decreased 4.5 percent, compared with a loss of
less than 1 percent for native-born workers.

foreclosure files per dedicated, full-time employee, 93% of Ocwen's foreclosure caseload was ahead of the Freddie Mac foreclosure timetable during the time period relevant to the subject dispute.

### C. The Disparate Impact of Appellee Ocwen's Servicing Practices

American-born Latinos and Latino immigrants such as Appellant Molina are at heightened risk for victimization under the grossly defective and discriminatory loan servicing practices of Appellee Ocwen Loan Servicing, as compared with similarly situated white borrowers. Through the acquisition of Appellant's mortgage, Ocwen had the opportunity to conduct its due diligence as to the terms of Appellant Molina's loan as well as to review the contents of Appellant Molina's loan application. The face of the loan application clearly would demonstrate to any reasonable financial institution that Molina's debt-to-income ratio was intolerable for the instant loan. It was also clear from the disclosures Molina made in his loan documents that Molina was a non-white Hispanic borrower.

While Ocwen's call centers allow for in-bound Spanish-speakers to speak with a Spanish-speaking representative, there was no policy in place, or at least implemented, with respect to out-bound calls made to Molina. Ocwen Loan Servicing's customer website, to which borrowers are frequently referred during the evaluation for foreclosure alternatives, is available only in English. When borrowers are evaluated for the federal HAMP modification, borrowers can be

notified of their HAMP application status via automated emails. These emails are in English.

Ocwen's dual track servicing system, which pursues loss mitigation options while simultaneously pursuing foreclosures, along with Ocwen's heightened emphasis on speedy foreclosures increases the likelihood that an American-born Latino or Latino immigrant borrower will lose his/her home to foreclosure because of (a) Ocwen's faulty loan servicing operation, (b) Ocwen's arbitrary criteria for foreclosure alternatives that disparately impact American-born Latinos and Latino immigrants, and (c) Ocwen's use of third-party foreclosure vendors that engage in reckless, illegal foreclosure practices for the sake of exceptionally speedy foreclosure rates, and mismanagement and lack of oversight of the same.

### 1. Studies on Subprime Loans and Their Effect on Minorities

Several studies illustrate the spread of subprime loans and their pronounced effect on minorities. In a study controlling for income and credit history, the Center for Responsible Lending found that minorities were significantly more likely than whites to receive subprime loans. Studies by the National Community Reinvestment Coalition have repeatedly confirmed race- and ethnicity-based disparities in high-cost lending after controlling for income. Moreover, disparities in lending between minorities and whites increased as borrowers' incomes increased. These studies demonstrate that there may be a significant otherwise

unexplained component in the loan origination process attributable to borrowers' race or ethnicity.  As Ocwen's business model has been based on the acquisition of servicing rights to subprime loans, a disproportionate number of minority borrowers were exposed to Ocwen's faulty servicing practices.

Lax underwriting standards and the popularity among lenders of nontraditional financial products contributed to a flourishing subprime market in the first part of the last decade.  When housing market conditions eventually reversed, the subprime market collapsed, leading to an unprecedented number of foreclosures all over the country and a series of failures among lending institutions. According to a report released by the Government Accountability Office in July 2009, approximately 1.6 million of the 14.4 million nonprime loans originated from 2000 through 2007 had completed the foreclosure process as of March 31, 2009.  Of the currently active nonprime loans, almost a quarter were either in default or in the foreclosure process, "indicating that hundreds of thousands of nonprime borrowers are at risk of losing their homes in the near future." According to RealtyTrac, Inc., 2.3 million properties received a foreclosure filing in 2008 alone.  In 2009, this number increased by 21 percent to 2.8 million, despite federal, state, and local efforts to stop foreclosures.

The devastating effects of the foreclosure crisis on wealth accumulation can hardly be overstated.  The U.S. Congress Joint Economic Committee estimates a

loss of housing wealth of $2.7 trillion over the period 2007-2009, as a direct result

of foreclosures.  Moreover, as minorities and low-income individuals

disproportionately maintain their wealth in their homes rather than in other assets,[2]

the current foreclosure crisis has disproportionately affected minority communities.

As a result, gains in minority homeownership that were achieved over the last

decade have been reversed.  For example, homeownership among Hispanics was at

48.6 percent in the first quarter of 2009, registering a drop from its peak in 2007.

The reversal of gains achieved in homeownership, and the resultant loss of wealth,

have exacerbated the already notable wealth inequalities in the United States.

The subprime market and subsequent foreclosures in the District of

Columbia metropolitan area are not very different from what has been observed in

the rest of the country.  The District of Columbia region has traditionally had a

resilient economy, with its industries centered on the needs of the federal

government.  Seemingly stable in previous years, the District of Columbia regional

housing market is currently showing alarming signs and is now one of the regions

with the fastest growing foreclosure rates in the nation.  Although the region had

one of the lowest foreclosure rates among major metropolitan areas in the first

quarter of 2007, by the first quarter of 2008, the rate of homes going into

foreclosure in the area was nearly six times higher than it had been in 2007.  Like

---

[2] Amaad Rivera and others, "*State of the Dream 200*9" (United for a Fair Economy, Boston, MA: 2009).

the foreclosure crisis nationwide, the District of Columbia regional crisis has been driven by subprime and nontraditional lending.  Subsequently, as neighborhoods are left with an increasing number of vacant properties, neighborhood decay accelerates, due to loss of property tax revenue, decline of home values, and increased crime and vandalism.

Several studies by the National Community Reinvestment Coalition confirm that individual Latino borrowers obtained subprime loans more often than white borrowers with similar credit scores, incomes, loan-to-value ratios, and neighborhood characteristics.  The studies confirm that disparities in lending have a clear racial component that has not been adequately addressed through enforcement of the nation's fair lending laws.  Even controlling for other factors, Latinos were seventy percent more likely than their white counterparts to receive a subprime loan.  This finding suggests that race, in itself, alters the likelihood of receiving a subprime loan.  Previous studies by the National Community Reinvestment Coalition have repeatedly confirmed race disparities in lending nationwide.  Minority borrowers are facing foreclosure more often than white borrowers, even after controlling for borrower, loan, and neighborhood characteristics.  The study finds that minorities, such as the proposed class members, are disproportionately affected by the foreclosure crisis, beyond levels that can be explained by objective criteria.  Indeed, Latinos were ninety percent

more likely than their similarly situated white counterparts to go into foreclosure. This suggests that race, in itself, alters the likelihood a borrower will go into foreclosure.

In a NCRC study dated April 29, 2010, researchers studied subprime lending and servicing trends in the District of Columbia metropolitan area. In the data set examined by the researchers, the study found that most of the loans issued to white borrowers were prime (93 percent) and only 1.36 percent of the loans to white borrowers were in foreclosure as of December 2008. In contrast, over 19 percent of the loans issued to Latinos were subprime. In addition, Latino borrowers had a share of loans in foreclosure of over 7 percent. That same study disqualified the borrower's credit score as a basis for explaining the disparity between the likelihood of receiving a subprime loan and entering foreclosure. In the data examined by researchers, 25.3 percent of the loans issued to borrowers with low FICO scores (i.e., a score of 640 or less) were subprime. In addition, 65 percent of all subprime loans had a low FICO score. However, almost 96 percent of loans issued to borrowers with low credit scores were not in foreclosure. Of the loans issued to borrowers with middle credit scores (i.e., a FICO score of 640 to 720), almost 12 percent were subprime and a little over 3.5 percent were in foreclosure. Loans issued to borrowers with high credit scores (i.e., over 720) were mostly prime (98 percent) and very few of those, .87 percent, went into foreclosure

14

between 2004 and 2008.  On average, subprime loan recipients reported a loan-to-value ratio of 86 percent, while that of prime borrowers was 74 percent.  Subprime borrowers had a lower original credit score (i.e., an average of 624) than borrowers receiving a prime loan (who had an average score of 712).  In addition, subprime loans were characterized by riskier mortgage terms and conditions than prime loans.  About 63 percent of prime loans were fixed-rate loans, while only 20 percent of subprime loans were fixed.  Only 5 percent of prime loans had pre-payment penalty terms, compared to almost 42 percent of subprime loans.  Less than one percent (0.4 percent) of prime loans had balloon terms, compared to 8 percent of the subprime loans.  However, "interest-only" terms seem to be more common among prime loans, with almost 23 percent of them reporting interest-only clauses, compared to 16 percent of subprime loans.

The study's findings also offer some clues to the role of securitization of mortgage products in the subprime market and the current foreclosure crisis.  Of the loans owned by government sponsored enterprises, almost 99 percent were prime, and over 99 percent were not in foreclosure.  In contrast, almost 34 percent of securitized loans were subprime, with over 6 percent of them falling into foreclosure by the end of 2008.  In addition, of the loans retained in lenders' portfolios (i.e., not securitized or sold), about 14 percent were subprime and close to 4 percent fell into foreclosure by December 2008.  Of all loans issued to

15

residents of low- and moderate-income neighborhoods, 14.5 percent and 16.3 percent, respectively, were subprime.  The corresponding share of subprime loans issued to residents of middle-income neighborhoods was 13.7 percent.  The lack of variation among the share of subprime loans issued in low-, moderate-, and middle-income neighborhoods suggests that income is not a primary determinant of the decision to issue a subprime product or to acquire a subprime loan for servicing.  Moreover, the share of loans in foreclosure was smaller in low-income neighborhoods than in both moderate- and middle-income areas.  In low-income neighborhoods, 1.96 percent of the loans were in foreclosure.  In comparison, moderate- and middle-income neighborhoods had a share of loans in foreclosure of over 3 percent.  Upper-income neighborhoods received the smallest share of subprime loans (8.1 percent).  Yet 1.86 percent of the loans issued to residents of upper-income neighborhoods were in foreclosure, close to the share of loans in foreclosure in low-income neighborhoods.

In short, minority borrowers are facing foreclosure more often than white borrowers, even after controlling for borrower, loan, and neighborhood characteristics.  Minorities are disproportionately affected by the foreclosure crisis, beyond levels that can be explained by objective criteria.  For two similarly situated borrowers in default, white and minority, Ocwen is likely to act more quickly to foreclose upon the minority borrower.  Without the ability to change

loan servicers, Molina and the members of the proposed class were subjected to a series of abusive servicing practices.  In turn, these practices led to harms that disparately impacted the minority borrowers Molina seeks to represent: heightened fees and costs; increased exposure to harassing and illegal debt collection activities; diminished access to opportunities for foreclosure alternatives; increased risk to foreclosure and the concomitant loss of equity, assessment of fees, and credit damage that come with that risk; and the stress, anxiety, humiliation, depression, and anger caused by the abusive loan servicing practices.

## SUMMARY OF ARGUMENT

The District Court erred in holding that Mr. Molina failed to allege a concrete injury.  The District Court's Memorandum Opinion stated that Mr. Molina has not been injured by Ocwen's practices because is still the owner and occupant of his home.  However, the FHA does not require that type of injury.  In fact, the FHA grants standing to any aggrieved person, which includes a person who believes he or she will suffer prohibited discrimination.  Moreover, a person is injured under the FHA if he or she is denied certain benefits of homeownership, which Mr. Molina did in fact allege.  Because the District Court took too narrow a view of FHA standing, the District Court should be reversed.

The District Court erred in holding that Mr. Molina was not exposed to discriminatory practices.  The Complaint alleged that Ocwen denied certain

foreclosure alternatives to its immigrant borrowers, such as Mr. Molina. The District Court assumed that Mr. Molina was required to request these foreclosure alternatives before he could claim discrimination. This assumption ignores the possibility that Ocwen was required by federal law to proactively offer foreclosure alternatives to its borrowers and that these offers were disproportionately withheld from Mr. Molina by reason of his race and national origin.

Even if this Court determines that Mr. Molina failed to allege sufficient facts to demonstrate standing, he requests remand with leave to amend the Complaint to correct any such deficiencies.

## ARGUMENT

### I. The Standard of Review.

In reviewing a Rule 12(b)(6) motion to dismiss, this Court must review the district court's dismissal *de novo* and treat the complaint's factual allegations as true and draw all reasonable inferences therefrom in the plaintiff's favor. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (internal citations omitted); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 161-162 (D.C. Cir. 2003).

"Rule 12(b)(6) is not a device for testing the truth of what is asserted or for determining whether a plaintiff has any evidence to back up what is in the complaint. If a complaint's factual allegations, and the reasonable inferences

18

derived from them, would support a legal theory entitling the plaintiff to some relief, a Rule 12(b)(6) motion should be denied." *ACLU Foundation of Southern California v. Barr*, 952 F.2d 457, 467 (D.C. Cir. 1991).

II.     **Mr. Molina Has Standing Under the FHA Because He Has Alleged Injury In The Form Of Denied Opportunity And Ocwen's Failure To Make Available To Him Certain Protected Transactions.**

Mr. Molina alleged that Ocwen's servicing policies placed him at a greater risk of foreclosure than similarly situated non-minority borrowers. More specifically, he alleged that he was denied certain foreclosure alternatives, including but not limited to loan modifications and that in many ways Ocwen placed him on a faster track to foreclosure than similarly situated non-minority borrowers. The District Court erred in holding that Mr. Molina was required to allege a deprivation of property or some other loss before he had standing to challenge Ocwen's policies under the FHA.

The Complaint alleged that a series of discriminatory practices listed in paragraph 106 "place American-born Latinos and Latino immigrants, whose loans are serviced by Ocwen, at greater risk of foreclosure than similarly situated white borrowers." Compl. at ¶ 107. Since the Complaint had already established both that Mr. Molina was a Latino immigrant and that Ocwen was his loan servicer,[3] the Complaint did allege that he was exposed to the policies that violated the FHA.

---

[3] *See* Compl. at ¶ 9 (establishing Mr. Molina's country of origin).

Adding to this, the Complaint alleged that "Plaintiff is as victimized by the disparate impact of Defendants' policies as any other member of the proposed class." Compl. at ¶ 20.

The specific policies in question were set forth in paragraph 106, which stated:

> Ocwen's dual-tracking system, when combined with its rapid foreclosure track, denies minority borrowers the opportunity to meaningfully engage in foreclosure alternatives that would be more financially beneficial to the minority borrowers than to Ocwen as compared to foreclosure because the foreclosure track is designed to proceed much more quickly than Ocwen's coordinate track for foreclosure alternatives. Ocwen's dual-tracking system and the policies that implement it place American-born Latinos and Latino immigrants in foreclosure at a higher rate than similarly situated white borrowers;

Compl. at ¶ 106(a).

> Ocwen's foreclosure alternatives, such as loan modifications, principal reductions, and short-sale programs, place great emphasis on loan-to-value ratios as an eligibility criterion, when minority borrowers of the subprime loans that Ocwen aggressively targeted are more likely than similarly situated white borrowers to have loan-to-value ratios that place them outside of consideration for certain foreclosure alternative programs;

Compl. at ¶ 106(b).

> Ocwen's foreclosure alternatives, such as loan modifications, principal reductions, and short-sale programs, place great emphasis on employment-based income as an eligibility criterion, when minority borrowers of the subprime loans that Ocwen aggressively targeted, are more likely than similarly situated white borrowers to have non-employment-based income that place them outside of consideration for certain foreclosure alternative programs. Ocwen's decision to

20

discount or completely disregard non-employment-based income, such as unemployment benefits or rental income, is arbitrary;

Compl. at ¶ 106(c).

Ocwen provides special preferential modification solutions to borrowers who are represented by attorneys. For instance, Ocwen has a special streamline modification plan available to borrowers who file for bankruptcy. In addition, Ocwen has a special policy of offering priority modification assistance to borrowers through their attorneys in lawsuits that contest the legality of their foreclosures. American-born Latinos and Latino immigrants whose loans are part of Ocwen's servicing portfolio have inferior access to legal representation as compared with similarly situated white borrowers. Because of these preferential programs available only to borrowers who can afford to hire an attorney, American-born Latinos and Latino immigrants have diminished access to Ocwen's proprietary loan modification products and are more likely to proceed into foreclosure than similarly situated white borrowers;

Compl. at ¶ 106(d).

[W]hen borrowers are otherwise ineligible for foreclosure alternatives, such as loan modifications and short-sales, Ocwen maintains internal policies that permit its staff to use discretion in overriding established program eligibility criteria. The factors considered by Ocwen's personnel under this set of discretionary decision-making leads to more white borrowers receiving discretionary assistance than similarly situated American-born Latinos and Latino immigrants, which has resulted in more American-born Latinos and Latino immigrants going through foreclosure and incurring the fees, expenses, heartache, and credit damage associated therewith… [These policies result in] American-born Latinos and Latino immigrants going into foreclosure in disproportionate numbers when compared to similarly situated non-minority borrowers;

Compl. at ¶ 106(e).

Ocwen maintains grossly inadequate controls on third-party vendors that carry out Ocwen's foreclosures, such as Defendant Shapiro &

Burson.  Ocwen's failure to supervise, manage, audit, and control the quality of its third-party default outsource service-providers has not only resulted in accelerated foreclosure rates for members of the proposed class, but has also permitted rampant wrongdoing, such as "robo-signing," which has had a disproportionate impact on the members of the proposed class as alleged herein.

Compl. at 106(f).

To be sure, Ocwen may assert that Mr. Molina lacks standing to challenge this policy if he never applied for a foreclosure alternative.  As the argument would might maintain, one who does not apply for a foreclosure alternative may not assert a cause of action for the deprivation of such an opportunity.  However, this argument fails to consider that Ocwen does not *offer* the foreclosure alternatives to minority borrowers because of their circumstances such as "property valuation, reason for default, and repayment ability that disproportionately exclude American-born Latinos and Latino immigrants…." Compl. at ¶ 35.  Or, borrowers are not offered preferential modifications until they hire an attorney.  *See* Compl. at ¶ 106(a)(d).

The District Court's assumption that Mr. Molina would have had to go out of his way to seek foreclosure alternatives before he would have the right to assert a discrimination claim ignores the possibility that Ocwen had independent legal obligations to solicit borrowers like Mr. Molina for these alternatives, but failed to do so.  For instance, one such requirement comes from the federal HAMP guidelines, which requires participating servicers to proactively solicit its

22

borrowers for loan modifications.[4]  If Ocwen failed to reach out to Mr. Molina, it is this failure to offer that required alternative that is discriminatory.  While it is true that Mr. Molina did not specifically allege that Ocwen failed to live up to this very specific type of obligation, he did allege in a sufficiently specific way that Ocwen's policies denied him foreclosure alternatives.  This was sufficient to place Ocwen on notice of the claims against it.  Thus, if Mr. Molina's allegation is true, he has set forth a claim upon which relief can be granted.  *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S. Ct. 1937, 1949-50 (2009) (noting that a complaint must only state a plausible claim for relief to survive a motion to dismiss for failure to state a claim).

In that regard, Mr. Molina's FHA standing comes from Ocwen's denial of housing-related opportunities, privileges, and facilities.  First, the denial of opportunity is specifically recognized in the FHA itself as a redressable harm.  The FHA gives standing to any "aggrieved person:"

> An ***aggrieved person*** may commence a civil action in an appropriate
> United States district court or State court not later than 2 years after
> the occurrence or the termination of an alleged discriminatory housing
> practice, or the breach of a conciliation agreement entered into under
> this title, whichever occurs last, to obtain appropriate relief with
> respect to such discriminatory housing practice or breach.

---

[4] *See, e.g.* Making Home Affordable, "Home Affordable Modification Program – Borrower Outreach and Communication," March 24, 2010, *available at* https://www.hmpadmin.com//portal/programs/docs/hamp_servicer/sd1002.pdf (last visited July 19, 2013).

42 U.S.C. § 3613(a)(1)(A) (emphasis added).

The statute defines who is such an aggrieved person:

> (i) "Aggrieved person" includes any person who--
>   (1) claims to have been injured by a discriminatory housing practice; or
>   (2) believes that such person will be injured by a discriminatory housing practice that is about to occur.[5]

42 U.S.C. § 3602.

The FHA defines what constitutes a discriminatory housing practice at 42

USCS § 3602, which includes the following:

> To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(b).

In interpreting this provision, the United States Department for Housing and

Urban Development ("HUD") has issued specific implementing regulations that

state in pertinent part:

> It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to engage in any conduct relating to the provision of housing or of services and ***facilities in connection***

---

[5] The District Court noted that Mr. Molina had not yet lost his home to foreclosure and has not yet been charged heightened fees throughout the foreclosure process. While that is true, the Complaint did explain that Mr. Molina was in fact in the foreclosure process. *See* Compl. at ¶¶ 71, 113-115. Under 42 U.S.C. § 3602(i)(2), Mr. Molina is an "aggrieved person" with standing because he believes that he inevitably will be injured by a discriminatory practice.

*therewith* that otherwise makes unavailable or denies dwellings to persons.

24 C.F.R. § 100.70(b) (emphasis added).

The HUD Regulations further state that it is illegal to do the following:

Engage in any conduct relating to the provision of housing which otherwise makes unavailable or denies dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin.

24 C.F.R. § 100.50(b)(3).

In addition, the FHA makes it illegal to discriminate in "making available"

certain transactions (like foreclosure alternatives in the form of loan modifications

or short-sale opportunities) related to residential real estate:

(a) In general. It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

(b) "Residential real estate-related transaction" defined. As used in this section, the term "residential real estate-related transaction" means any of the following:

(1) The making or purchasing of loans or providing other financial assistance--
(A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or
(B) secured by residential real estate.

42 U.S.C. § 3605.

25

In light of these principles, the Complaint did allege that Mr. Molina was in fact denied the "facilities in connection" and the "privileges" of homeownership when Ocwen denied to him access to foreclosure alternatives that were more readily available to similarly situated non-minority borrowers; when it offered preferential foreclosure alternatives to borrowers in special circumstances; and when it hired and failed to supervise a law firm that routinely broke the law in the foreclosure process for the purpose of engaging a speedy foreclosure. At the same time, the Complaint alleged that Ocwen failed to "make available" certain foreclosure alternatives.

Further, the federal courts have long recognized that at least in the civil rights context the denial of opportunities is a basis for standing. *See, e.g. Alfred L. Snapp & Son v. P.R.*, 458 U.S. 592, 608 (U.S. 1982) (upholding standing where "Puerto Ricans were denied the benefits of access to domestic work opportunities that the Wagner-Peyser Act and the Immigration and Nationality Act of 1952 were designed to secure for United States workers").

Furthermore, to the extent Mr. Molina has failed to specifically identify himself in the Complaint with particular allegations, he did on numerous occasions place himself in the context of a larger group of minority borrowers. He did this by referring throughout the Complaint to "class members," "proposed class members," "Latino borrowers," and "immigrant Latino borrowers," all of which

26

included himself.  As the Supreme Court explained in *Barrows v. Jackson*, traditional standing rules become somewhat relaxed when an individual seeks to protect fundamental rights of others. 346 U.S. 249 (U.S. 1953).

This Court acknowledged and enforced that point in *Mayers v. Ridley*,

> [T]his is an occasion when the reasons underlying the normal rule denying standing to raise another's rights "are outweighed by the need to protect the fundamental rights" of those whom Congress has sought to protect by the fair housing provisions.

465 F.2d 630, 654 (D.C. Cir. 1972) (quoting *Barrows*, 346 U.S. at 257).

As such, Mr. Molina standing to protect the rights of other minority borrowers who are situated similarly because he was sufficiently exposed to Ocwen's discriminatory servicing practices.

Nevertheless, the Complaint does set forth sufficient allegations that Ocwen violated the FHA in failing to make available certain foreclosure alternatives to him and the District Court erred in its holding that Mr. Molina was required to show that he first sought those opportunities.  If Mr. Molina can establish that Ocwen had independent obligations to proactively offer those alternatives absent any initiation by Mr. Molina, he has a viable cause of action under the FHA.  In addition, Mr. Molina sufficiently alleged that he was placed in the foreclosure process, which will result in the inevitable harm that makes him an "aggrieved person" within the meaning of the statute.

For these reasons, Mr. Molina has standing under the FHA.

27

**III.  Even If This Court Finds That Mr. Molina Lacks Standing, He Should Be Permitted Leave To Amend The Complaint On Remand.**

Should this Court determine that Mr. Molina has not sufficiently alleged standing, Mr. Molina requests a remand with leave to amend the Complaint.  *See Spann v. Colonial Village, Inc.*, 899 F.2d 24, 28 (D.C. Cir. 1990) ("The courts may also permit plaintiffs to amend their complaints to make the necessary allegations."); *see also Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 95, 113 n. 25 (1979) (finding standing for some plaintiffs based on allegations in complaints "as illuminated by subsequent discovery" and permitting other plaintiffs "to amend their complaints to include allegations of actual harm").

In light of the allegations currently in the Complaint, it would not be futile to permit Mr. Molina time to amend the Complaint to more directly relate his personal experience with Ocwen's servicing practices.  As such, if the Court should find that Mr. Molina lacks standing, he requests that this Court remand the case with leave to amend the Complaint.

<u>CONCLUSION</u>

In light of the foregoing, Mr. Molina respectfully requests that this Court reverse the decision of the District Court on the grounds that Mr. Molina's Complaint alleged standing under the Federal Fair Housing Act.  Alternatively, should this Court determine that Mr. Molina failed to allege sufficient facts to set

forth a claim for standing, he requests that the Court remand the case with leave to

amend the Complaint.

Respectfully submitted,

Ian Stumpf (USCA/DC Bar #53862)
istumpf@jrhlegalstrategies.com
**JR HOWELL & ASSOCIATES**
515 8th Street, SE
Suite 1
Washington, D.C. 20003
P: 202.518.2591
F: 202.518.2571
*Attorney for Appellant*

# TEXT OF PERTINENT STATUTES AND RULES

UNITED STATES CODE SERVICE
Copyright © 2013 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved.

*** Current through PL 113-18, approved 7/12/13 ***

TITLE 42. THE PUBLIC HEALTH AND WELFARE
CHAPTER 45. FAIR HOUSING
GENERALLY

**Go to the United States Code Service Archive Directory**

*42 USCS § 3602*

§ 3602. Definitions

As used in this title--

(a) "Secretary" means the Secretary of Housing and Urban Development.

(b) "Dwelling" means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof.

(c) "Family" includes a single individual.

(d) "Person" includes one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under title 11 of the United States Code [*11 USCS §§ 101* et seq.], receivers, and fiduciaries.

(e) "To rent" includes to lease, to sublease, to let and otherwise to grant for a consideration the right to occupy premises not owned by the occupant.

(f) "Discriminatory housing practice" means an act that is unlawful under section 804, 805, 806, or 818 [*42 USCS §§ 3604, 3605, 3606,* or *3617*].

(g) "State" means any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, or any of the territories and possessions of the United States.

(h) "Handicap" means, with respect to a person--

(1) a physical or mental impairment which substantially limits one or more of such person's major life activities,
(2) a record of having such an impairment, or
(3) being regarded as having such an impairment.

but such term does not include current, illegal use of or addiction to a controlled substance (as defined in section 102 of the Controlled Substances Act (*21 U.S.C. 802*)).

(i) "Aggrieved person" includes any person who--
(1) claims to have been injured by a discriminatory housing practice; or
(2) believes that such person will be injured by a discriminatory housing practice that is about to occur.

(j) "Complainant" means the person (including the Secretary) who files a complaint under section 810 [*42 USCS § 3610*].

(k) "Familial status" means one or more individuals (who have not attained the age of 18 years) being domiciled with--
   (1) a parent or another person having legal custody of such individual or individuals; or
   (2) the designee of such parent or other person having such custody, with the written permission of such parent or other person.

The protections afforded against discrimination on the basis of familial status shall apply to any person who is pregnant or is in the process of securing legal custody of any individual who has not attained the age of 18 years.

(l) "Conciliation" means the attempted resolution of issues raised by a complaint, or by the investigation of such complaint, through informal negotiations involving the aggrieved person, the respondent, and the Secretary.

(m) "Conciliation agreement" means a written agreement setting forth the resolution of the issues in conciliation.

(n) "Respondent" means--
   (1) the person or other entity accused in a complaint of an unfair housing practice; and
   (2) any other person or entity identified in the course of investigation and notified as required with respect to respondents so identified under section 810(a) [*42 USCS § 3610(a)*].

(o) "Prevailing party" has the same meaning as such term has in section 722 of the Revised Statutes of the United States (*42 U.S.C. 1988*).

UNITED STATES CODE SERVICE
Copyright © 2013 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved.

*** Current through PL 113-18, approved 7/12/13 ***

TITLE 42. THE PUBLIC HEALTH AND WELFARE
CHAPTER 45. FAIR HOUSING
GENERALLY

**Go to the United States Code Service Archive Directory**

*42 USCS § 3604*

§ 3604.  Discrimination in the sale or rental of housing and other prohibited practices.

As made applicable by section 803 [*42 USCS § 3603*] and except as exempted by sections 803(b) and 807 [*42 USCS §§ 3603(b), 3607*], it shall be unlawful--

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

(d) To represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

(e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, handicap, familial status, or national origin.

 (f) (1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter

because of a handicap of--
    (A) that buyer or renter.[;]
    (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
    (C) any person associated with that buyer or renter.
 (2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of--
    (A) that person; or
    (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
    (C) any person associated with that person.

(3) For purposes of this subsection, discrimination includes--

(A) a refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by such person if such modifications may be necessary to afford such person full enjoyment of the premises except that, in the case of a rental, the landlord may where it is reasonable to do so condition permission for a modification on the renter agreeing to restore the interior of the premises to the condition that existed before the modification, reasonable wear and tear excepted.[:]

(B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling; or

(C) in connection with the design and construction of covered multifamily dwellings for first occupancy after the date that is 30 months after the date of enactment of the Fair Housing Amendments Act of 1988 [enacted Sept. 13, 1988], a failure to design and construct those dwellings in such a manner that--

(i) the public use and common use portions of such dwellings are readily accessible to and usable by handicapped persons;

(ii) all the doors designed to allow passage into and within all premises within such dwellings are sufficiently wide to allow passage by handicapped persons in wheelchairs; and

(iii) all premises within such dwellings contain the following features of adaptive design:

(I) an accessible route into and through the dwelling;

(II) light switches, electrical outlets, thermostats, and other environmental controls in accessible locations;

(III) reinforcements in bathroom walls to allow later installation of grab bars; and

(IV) usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space.

(4) Compliance with the appropriate requirements of the American National Standard for buildings and facilities providing accessibility and usability for physically handicapped people (commonly cited as "ANSI A117.1") suffices to satisfy the requirements of paragraph (3)(C)(iii).

(5) (A) If a State or unit of general local government has incorporated into its laws the requirements set forth in paragraph (3)(C), compliance with such laws shall be deemed to satisfy the requirements of that paragraph.

(B) A State or unit of general local government may review and approve newly constructed covered multifamily dwellings for the purpose of making determinations as to whether the design and construction requirements of paragraph (3)(C) are met.

(C) The Secretary shall encourage, but may not require, States and units of local government to include in their existing procedures for the review and approval of newly constructed covered multifamily dwellings, determinations as to whether the design and construction of such dwellings are consistent with paragraph (3)(C), and shall provide technical assistance to States and units of local government and other persons to implement the requirements of paragraph (3)(C).

(D) Nothing in this title shall be construed to require the Secretary to review or approve the plans, designs or construction of all covered multifamily dwellings, to determine whether the design and construction of such dwellings are consistent with the requirements of paragraph 3(C).

(6) (A) Nothing in paragraph (5) shall be construed to affect the authority and responsibility of the Secretary or a State or local public agency certified pursuant to section 810(f)(3) of this Act [42 USCS § 3610(f)(3)] to receive and process complaints or otherwise engage in enforcement activities under this title.

(B) Determinations by a State or a unit of general local government under paragraphs (5)(A) and (B) shall not be conclusive in enforcement proceedings under this title.


(7) As used in this subsection, the term "covered multifamily dwellings" means--

(A) buildings consisting of 4 or more units if such buildings have one or more elevators; and

(B) ground floor units in other buildings consisting of 4 or more units.

(8) Nothing in this title shall be construed to invalidate or limit any law of a State or political subdivision of a State, or other jurisdiction in which this title shall be effective, that requires dwellings to be designed and constructed in a manner that affords handicapped persons greater access than is required by this title.

(9) Nothing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others.

UNITED STATES CODE SERVICE
Copyright © 2013 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved.

\*\*\* Current through PL 113-18, approved 7/12/13 \*\*\*

TITLE 42. THE PUBLIC HEALTH AND WELFARE
CHAPTER 45. FAIR HOUSING
GENERALLY

**Go to the United States Code Service Archive Directory**

*42 USCS § 3605*

§ 3605.  Discrimination in residential real estate-related transactions

(a) In general.  It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

(b) "Residential real estate-related transaction" defined.  As used in this section, the term "residential real estate-related transaction" means any of the following:
  (1) The making or purchasing of loans or providing other financial assistance--
    (A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or
    (B) secured by residential real estate.
  (2) The selling, brokering, or appraising of residential real property.

(c) Appraisal exemption.  Nothing in this title prohibits a person engaged in the business of furnishing appraisals of real property to take into consideration factors other than race, color, religion, national origin, sex, handicap, or familial status.

UNITED STATES CODE SERVICE
Copyright © 2013 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved.

*** Current through PL 113-18, approved 7/12/13 ***

TITLE 42. THE PUBLIC HEALTH AND WELFARE
CHAPTER 45. FAIR HOUSING
GENERALLY

**Go to the United States Code Service Archive Directory**

*42 USCS § 3613*

§ 3613. Enforcement by private persons

(a) Civil action.

  (1) (A) An aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice, or the breach of a conciliation agreement entered into under this title, whichever occurs last, to obtain appropriate relief with respect to such discriminatory housing practice or breach.

   (B) The computation of such 2-year period shall not include any time during which an administrative proceeding under this title was pending with respect to a complaint or charge under this title based upon such discriminatory housing practice. This subparagraph does not apply to actions arising from a breach of a conciliation agreement.

  (2) An aggrieved person may commence a civil action under this subsection whether or not a complaint has been filed under section 810(a) [*42 USCS § 3610(a)*] and without regard to the status of any such complaint, but if the Secretary or a State or local agency has obtained a conciliation agreement with the consent of an aggrieved person, no action may be filed under this subsection by such aggrieved person with respect to the alleged discriminatory housing practice which forms the basis for such complaint except for the purpose of enforcing the terms of such an agreement.

  (3) An aggrieved person may not commence a civil action under this subsection with respect to an alleged discriminatory housing practice which forms the basis of a charge issued by the Secretary if an administrative law judge has commenced a hearing on the record under this title with respect to such charge.

(b) Appointment of attorney by court. Upon application by a person alleging a discriminatory housing practice or a person against whom such a practice is alleged, the court may--

  (1) appoint an attorney for such person; or

  (2) authorize the commencement or continuation of a civil action under subsection (a) without the payment of fees, costs, or security, if in the opinion of the court such person is financially unable to bear the costs of such action.

(c) Relief which may be granted.

  (1) In a civil action under subsection (a), if the court finds that a discriminatory housing practice has occurred or is

about to occur, the court may award to the plaintiff actual and punitive damages, and subject to subsection (d), may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).

  (2) In a civil action under subsection (a), the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee and costs. The United States shall be liable for such fees and costs to the same extent as a private person.

(d) Effect on certain sales, encumbrances, and rentals. Relief granted under this section shall not affect any contract, sale, encumbrance, or lease consummated before the granting of such relief and involving a bona fide purchaser, encumbrancer, or tenant, without actual notice of the filing of a complaint with the Secretary or civil action under this title.

(e) Intervention by Attorney General.  Upon timely application, the Attorney General may intervene in such civil action, if the Attorney General certifies that the case is of general public importance. Upon such intervention the Attorney General may obtain such relief as would be available to the Attorney General under section 814(e) [*42 USCS § 3614(e)*] in a civil action to which such section applies.

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright (c) 2013, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** This section is current through the July 11, 2013 ***
*** issue of the Federal Register ***

TITLE 24 -- HOUSING AND URBAN DEVELOPMENT
SUBTITLE B -- REGULATIONS RELATING TO HOUSING AND URBAN DEVELOPMENT
CHAPTER I -- OFFICE OF ASSISTANT SECRETARY FOR EQUAL OPPORTUNITY, DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT
SUBCHAPTER A -- FAIR HOUSING
PART 100 -- DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT
SUBPART B -- DISCRIMINATORY HOUSING PRACTICES

**Go to the CFR Archive Directory**

*24 CFR 100.50*

§ 100.50 Real estate practices prohibited.

(a) This subpart provides the Department's interpretation of conduct that is unlawful housing discrimination under section 804 and section 806 of the Fair Housing Act. In general the prohibited actions are set forth under sections of this subpart which are most applicable to the discriminatory conduct described. However, an action illustrated in one section can constitute a violation under sections in the subpart. For example, the conduct described in § 100.60(b)(3) and (4) would constitute a violation of § 100.65(a) as well as § 100.60(a).

(b) It shall be unlawful to:

(1) Refuse to sell or rent a dwelling after a bona fide offer has been made, or to refuse to negotiate for the sale or rental of a dwelling because of race, color, religion, sex, familial status, or national origin, or to discriminate in the sale or rental of a dwelling because of handicap.

(2) Discriminate in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with sales or rentals, because of race, color, religion, sex, handicap, familial status, or national origin.

(3) Engage in any conduct relating to the provision of housing which otherwise makes unavailable or denies dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin.

(4) Make, print or publish, or cause to be made, printed or published, any notice, statement or advertisement with respect to the sale or rental of a dwelling that indicates any preference, limitation or discrimination because of race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation or discrimination.

(5) Represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that a dwelling is not available for sale or rental when such dwelling is in fact available.

(6) Engage in blockbusting practices in connection with the sale or rental of dwellings because of race, color, religion, sex, handicap, familial status, or national origin.

(7) Deny access to or membership or participation in, or to discriminate against any person in his or her access to or membership or participation in, any multiple-listing service, real estate brokers' assocation, or other service organization or facility relating to the business of selling or renting a dwelling or in the terms or conditions or membership or participation, because of race, color, religion, sex, handicap, familial status, or national origin.

(c) The application of the Fair Housing Act with respect to persons with handicaps is discussed in subpart D of this part.

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright (c) 2013, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** This section is current through the July 11, 2013 ***
*** issue of the Federal Register ***

TITLE 24 -- HOUSING AND URBAN DEVELOPMENT
SUBTITLE B -- REGULATIONS RELATING TO HOUSING AND URBAN DEVELOPMENT
CHAPTER I -- OFFICE OF ASSISTANT SECRETARY FOR EQUAL OPPORTUNITY, DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT
SUBCHAPTER A -- FAIR HOUSING
PART 100 -- DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT
SUBPART B -- DISCRIMINATORY HOUSING PRACTICES

**Go to the CFR Archive Directory**

*24 CFR 100.70*

§ 100.70 Other prohibited sale and rental conduct.

(a) It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to restrict or attempt to restrict the choices of a person by word or conduct in connection with seeking, negotiating for, buying or renting a dwelling so as to perpetuate, or tend to perpetuate, segregated housing patterns, or to discourage or obstruct choices in a community, neighborhood or development.

(b) It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to engage in any conduct relating to the provision of housing or of services and facilities in connection therewith that otherwise makes unavailable or denies dwellings to persons.

(c) Prohibited actions under paragraph (a) of this section, which are generally referred to as unlawful steering practices, include, but are not limited to:

(1) Discouraging any person from inspecting, purchasing or renting a dwelling because of race, color, religion, sex, handicap, familial status, or national origin, or because of the race, color, religion, sex, handicap, familial status, or national origin of persons in a community, neighborhood or development.

(2) Discouraging the purchase or rental of a dwelling because of race, color, religion, sex, handicap, familial status, or national origin, by exaggerating drawbacks or failing to inform any person of desirable features of a dwelling or of a community, neighborhood, or development.

(3) Communicating to any prospective purchaser that he or she wold not be comfortable or compatible with existing residents of a community, neighborhood or development because of race, color, religion, sex, handicap, familial status, or national origin.

(4) Assigning any person to a particular section of a community, neighborhood or development, or to a particular floor of a building, because of race, color, religion, sex, handicap, familial status, or national origin.

(d) Prohibited activities relating to dwellings under paragraph (b) of this section include, but are not limited to:

(1) Discharging or taking other adverse action against an employee, broker or agent because he or she refused to participate in a discriminatory housing practice.

(2) Employing codes or other devices to segregate or reject applicants, purchasers or renters, refusing to take or to show listings of dwellings in certain areas because of race, color, religion, sex, handicap, familial status, or national origin, or refusing to deal with certain brokers or agents because they or one or more of their clients are of a particular race, color, religion, sex, handicap, familial status, or national origin.

(3) Denying or delaying the processing of an application made by a purchaser or renter or refusing to approve such a person for occupancy in a cooperative or condominium dwelling because of race, color, religion, sex, handicap, familial status, or national origin.

(4) Refusing to provide municipal services or property or hazard insurance for dwellings or providing such services or insurance differently because of race, color, religion, sex, handicap, familial status, or national origin.

(5) Enacting or implementing land-use rules, ordinances, policies, or procedures that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)

I hereby certify, upon my oath, that the Principal Brief complies with Rule 32(a)(7), containing 6480 words and 629 lines of monospaced type text.

Ian Stumpf, Attorney for Appellant

<u>**CERTIFICATE OF SERVICE**</u>

United States Court of Appeals for the District of Columbia Circuit
Case No. 12-5229
---------------------------------------------------------)
SAMUEL MOLINA,
*Appellant,*
*vs.*

FDIC, *ET AL.,*
*Appellees.*
---------------------------------------------------------)

I, Ian Stumpf, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

On the 19th Day of July, 2013, I served the within 2 copies of the Brief for Appellant and 1 copy of the Appendix upon:

> OCWEN LOAN SERVICING
> c/o Kenneth John Pfaehler, Esq.
> DENTONS US LLP
> 1301 K Street, NW
> Suite 600, East Tower
> Washington, DC 20005

Via FedEx, by causing a copy, enclosed in a properly addressed wrapper, to be deposited in an official depository.

Unless otherwise noted, 8 copies of the Appellant's Brief and 8 copies of the Appendix have been sent to the Court on the same date as above via FedEx. Further, the Appendix and Appellant's Brief were filed using the Court's ECF system.

July 19, 2013

_____
Ian Stumpf, Attorney for Appellant

42